SO ORDERED.

SIGNED this 2 day of September, 2025.

_Joseph N. Callaway_
**Joseph N. Callaway**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## RALEIGH DIVISION

IN RE:

**WIRELESS SYSTEMS SOLUTIONS LLC,**                    **Case No. 22-00513-5-JNC**
                                                       **Chapter 7**
        **Debtor.**

_____

**GEORGE F. SANDERSON III, Ch. 7 Trustee,**

        **Plaintiff,**

**v.**                                                 **Adv. Pro. No. 24-00016-5-JNC**

**SUSAN L. GROSS FAMILY TRUST; and LASLO**
**GROSS, in his capacity as trustee for the Susan**
**L. Gross Family Trust**

        **Defendants**

### <u>MEMORANDUM OPINION</u>

This adversary proceeding was initiated on March 5, 2024, by plaintiff George F.

Sanderson III, Chapter 7 Trustee for the Bankruptcy Estate of Wireless Systems Solutions LLC

against defendants the Susan L. Gross Family Trust ("Trust") and Laslo Gross in his capacity as

1

trustee for the Trust (collectively "Defendants") seeking to avoid certain transfers from the chapter 7 debtor in the bankruptcy case, Wireless Systems Solutions, LLC ("Wireless"), directly to the Trust. (*See* Dkt. 1, the "Complaint.")

A trial in this matter was conducted on June 12, 2025 in Greenville, North Carolina. George F. Sanderson III, the chapter 7 Trustee for the bankruptcy estate of Wireless ("Trustee" or "Plaintiff") appeared as the attorney for the Trustee.  J.M. Cook appeared as attorney for the Defendants.  At the conclusion of the one-day trial, the matter was taken under advisement. By separate concurrent order, a judgment is entered finding for the Plaintiff and against the Defendants. This opinion sets forth the basis of that decision.

## JURISDICTION

The court has full jurisdiction over the parties and the subject matter in this proceeding pursuant to 28 U.S.C. §§ 151, 157, and 1334, and the General Order of Reference entered by the United States District Court for the Eastern District of North Carolina on August 3, 1984. The parties admit this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Additionally, the parties consented to the bankruptcy judge hearing and determining the proceeding. (Dkt. 71.) The court has constitutional authority to hear and enter a final decision in this contested matter. *Wellness Int'l Network, Ltd., v Sharif*, 575 U.S. 665, 683, 135 S. Ct. 1932, 1947 (2015).

## PROCEDURAL BACKGROUND

Wireless filed a voluntary chapter 11 bankruptcy petition on March 9, 2022. SmartSky Networks, LLC ("SmartSky") holds the largest unsecured claim against Wireless. Proof of Claim No. 5, filed July 7, 2022 lists the claim amount at $12,986,212.33 based on an arbitration award. The case was converted to chapter 7 on October 12, 2022 (BK Dkt. 279;). Richard D. Sparkman was appointed chapter 7 trustee (BK Dkt. 282), and upon his retirement George F. Sanderson was appointed successor chapter 7 trustee on August 17, 2023.

The Trustee filed the Complaint on March 5, 2024. Summarizing its allegations, he contends that on March 6, 2020, monetary transfers totaling $1,000,000.00 (together, the "Transfer") were made by Wireless to the Trust that constitute a voidable transfer pursuant to 11 U.S.C. § 544 and relevant sections of the North Carolina Uniform Voidable Transactions Act (N.C. Gen. Stat. § 39-23.4 et seq.). Acting in his capacity as trustee for the Trust, Laslo Gross filed a pro se answer for the Defendants on April 3, 2024 (Dkt. 4). The Trustee responded with a Motion to Strike Answer (Dkt. 9) for lack of licensed counsel. The Trust sought and was granted an extension of time to secure an attorney and properly file an answer, which it did on July 8, 2024 (Dkt. 28, the "Answer"). Defendants' Motion for Summary Judgment (Dkt. 52) was denied by order dated April 9, 2025 (Dkt. 60). The matter progressed to trial.

## STIPULATIONS

Prior to trial, the parties submitted a proposed a Joint Pretrial Order, which the court accepted and entered on June 10, 2025 (Dkt. 71). In it, the parties stipulated to the following facts, (the "Stipulations"):

1. Wireless Systems Solutions, LLC ("Debtor") acted as a supplier of SmartSky Networks, LLC ("SmartSky") for components of an Air-to-Ground (ATG) wireless communications network starting on or about December 23, 2017.

2. On April 25, 2019, the Debtor and SmartSky Networks, Inc. ("SmartSky") entered into a "Teaming Agreement."

3. The Teaming Agreement contained a provision that provided for damages for breaches of performance obligations under the Teaming Agreement of up to $10,000,000.00.

4. On March 6, 2020, the Debtor transferred $1,000,000.00 ("Transfer") from the Debtor to the Susan L. Gross Family Trust ("Trust").

5. On September 10, 2020, SmartSky filed a Complaint against the Debtor and others for alleged violations of the Teaming Agreement.

6. On October 1, 2021, SmartSky received an award, among other relief, of $10,000,000 against the Debtor.

7. On March 9, 2022, the Debtor filed for bankruptcy protection under Chapter 11 of the United States Bankruptcy Code.

8. On 12 October 2022, the Court converted the case to one arising under Chapter 7 and appointed Richard P. Sparkman as Trustee.

9. On 17 August 2023, the Court appointed George Sanderson as successor trustee.

10. On March 5, 2024, the Trustee instituted this action against the Defendants. Stipulations 1-10.

## SUMMARY OF TRIAL TESTIMONY

At trial,[1] the court heard testimony first from Susan L. Gross ("Mrs. Gross"). Her testimony largely centered on the history of Wireless, the creation and contended purpose of the Trust and the subsequent Transfer. Mrs. Gross was the 99.99% owner of Wireless until August 2020 (Trial Audio at Dkt. 75, 00:26:36), when she transferred the stock to a separate family held trust, known as the Gross Family Protection Trust.[2] Mrs. Gross holds a master's degree in business administration from George Washington University. (BK Dkt. 78 at 00:30:40.) She and her

---

[1] *See* PDF with attached Audio File (Dkts 74, 75), collectively the "Trial Audio."
[2] The Trust was formed on February 4, 2020. (Plaintiff Ex. 9.) At the time of the Trust's formation, and on the date of the Transfer, Susan Gross, individually, was the 99.99% owner of Wireless. (Trial Audio at Dkt. 75, 00:26:36.) Around July of 2020, another trust was formed, the Gross Family Protection Trust. (Dkt. 82, the "Susan Gross Dep." 12:20-13:2). On August 3, 2020, SmartSky sent Wireless a breach letter. (Trial Audio at Dkt. 75, 01:56:25.) Also on August 3, 2020, Mrs. Gross transferred her 99.99% ownership interest in Wireless into the Gross Family Protection Trust. (Trial Audio at Dkt. 75, 01:56:38.) Mrs. Gross is the family trustee for the Gross Family Protection Trust, and Premier Trust, Inc., is the independent trustee. (Susan Gross Dep. 55:24-56:5; *see also* BK Dkt. 8, Corporate Resolution).

4

husband, Laslo Gross, formed, owned, controlled, and worked full time at Wireless. (BK Dkt. 78 at 00:30:28, 00:41:27.)

Mrs. Gross also testified about the business operations of Wireless, including its rocky business relationship with SmartSky. (Trial Audio at Dkt. 75,01:03:49.) She further testified regarding the Trust's subsequent use of the Transfer, the majority of which was expended to purchase real estate in the name of the Trust. (Trial Audio at Dkt. 75, 00:30:59.) Mrs. Gross maintains the Trust was formed and the Transfer was made solely for personal estate planning purposes, unaffected by the concurrent business problems of Wireless. She contends the arbitration process between Wireless and SmartSky that resulted in a $12,548,892.04 decision against Wireless, her, and Mr. Gross was an unrelated event. (Dkt. 80-2, Plaintiff Ex. 3.)

Laslo Gross, the husband of Susan Gross, ("Mr. Gross") testified next. He is named as a defendant in this action solely in his capacity as the trustee of the Trust. Mr. Gross worked at Wireless at all pertinent times, serving as its chief operating officer, heading business development, directing engineers, and handling other managerial aspects of the business. (Trial Audio at Dkt. 74, 002:27.) He holds a master's degree in business administration from George Washington University. (BK Dkt. 78 at 00:33:52.) The remainder of the testimony of Mr. Gross largely consisted of a detailed explanation of Wireless's business model and operations, the situation with SmartSky, and a general description of the relevant technology. He provided context regarding Wireless's concerns with the validity and extent of SmartSky's funding commitment, and his take on the arbitration process and outcome.

## FACTUAL FINDINGS

### The Wireless/SmartSky Relationship

Wireless was formed at or around the end of the 2015 calendar year. Until August 2020, Mrs. Gross was the 99.99% owner of Wireless (Susan Gross Dep. 11:19-13:9; see FN 2 *supra*).

5

Mr. Gross is the manager of Wireless. (Dkt. 81, the "Laslo Gross Dep." at 6:25-7:3). Prior to bankruptcy, Wireless focused on the creation of wireless communication hard devices and 4G software products. Initially, Wireless produced a study for SmartSky regarding software issues on its products. That consultation evolved into Wireless producing and supplying SmartSky with key components of its air-to-ground ("ATG") wireless communications network on December 23, 2017. (Trial Audio at Dkt. 75, 00:38:42; Pretrial Order, Stipulation #1).[3]

---

[3] At trial Mrs. Gross attempted to refute parts of the Stipulations, specifically here the December 23, 2017 start date. She declared the Stipulations to be an inaccurate representation of the timeline of the Wireless/SmartSky relationship. The case record, including findings in the detailed 81-page arbitration decision and her testimony in numerous other hearings conducted in the Wireless chapter 11 case before it was converted demonstrates a contrary conclusion, and the Defendants will be held to the Stipulations.

This incident illustrates a recuring theme throughout the bankruptcy case and related adversary proceedings, namely that Mrs. Gross consistently suffers from selective memory issues with a distinct tendency to state whatever version of the truth she believes best suits her interests at the moment she makes a particular statement. For example, see BK Dkt. 283, PDF with attached Audio File (cross-examination by attorney for SmartSky Christopher J. Blake concerning Mrs. Gross' lack of disclosure of her involvement in negotiating a lease agreement for Wireless on behalf of NextGen Com, a company owned by her son Michael Gross):

at 01:48:16-01:48:44
Attorney Blake: "Did you tell me that at the last hearing?"
Mrs. Gross: "You didn't ask me."
Attorney Blake: "I asked you if you knew anything about NextGen and your answer was no."
Mrs. Gross: "That is an erroneous testimony, I'm sure I just blanked."
Attorney Blake: "You're sure you did what?"
Mrs. Gross: "I'm sure it was a mistake on my part it was not an intention of saying no."
Attorney Blake: "So you're saying you just blanked, you panicked."
Mrs. Gross: "Probably, yeah."
Attorney Blake: " Because you know I had caught you in an untruthful statement, correct?"

at 01:49:02-01:49:40
Attorney Blake: "My question at the last hearing was if you knew anything about NexGen, your answer was 'No'."
Mrs. Gross: "I know nothing about the operations of NextGen."
Attorney Blake: "And then after that hearing, I get an email that shows that you were negotiating an amendment for the lease on behalf of NextGen, isn't that correct?"
Mrs. Gross: "That is correct."
Attorney Blake: "I also asked you at the hearing last week if you knew anything about the lease, just anything at all and your answer was no."
Mrs. Gross: "I did not sign the lease, so I don't know about the lease. I did not know about the lease contents."

These and numerous other factually dubious (and more importantly, consistently inconsistent) sworn oral and written statements of Mrs. Gross given in the Wireless chapter 11 case were proven demonstrably and knowingly false. This is also true for Mr. Gross. See, e.g., Notice of Erroneous Testimony (BK Dkt. 277) filed by counsel for Wireless. Of particular concern to the court were the material inaccuracies contained in the

In March or April 2019, SmartSky approached Wireless and asked Wireless to make a $25 million investment in SmartSky (the "Investment Offer"). SmartSky presented a prospectus to Wireless, which made Wireless "nervous" about the funding and revenue for SmartSky. Despite these apparent misgivings, the relationship between Wireless and SmartSky progressed, and the parties entered into a teaming agreement dated April 25, 2019 (the "Teaming Agreement") (Dkt. 83, Plaintiff Ex. 4). The purpose of the Teaming Agreement was for Wireless to develop and supply products for integration into SmartSky products and services. (Dkt. 80-2, Plaintiff Ex. 3, p. 42). It contained a provision that provided for damages for breaches of performance obligations under the Teaming Agreement of up to $10,000,000.00. (Stipulation #3.)

In 2019, Wireless had revenues of around $16,075,033, the vast majority of which came from its business relationship with SmartSky (00:40:00). As of December, 31, 2019 Wireless had approximately $5,600,000 in cash on hand. (Dkt. 80-6, Plaintiff Ex. 10.)

**The Formation of the Trust**

Mrs. Gross asserts she sought out personal estate planning services beginning in 2019. On September 25, 2019, she sent an email to Carolyn Hall and Mary Vasilescu, both employees of Wiss & Company, LLP ("Wiss"). (Dkt. 80-7, Plaintiff Ex. 14.) Wiss had been engaged by Wireless since 2018 for purposes of providing accounting services and handling records for Wireless. (Trial Audio at Dkt. 75, 00:42:38.) In that email, Mrs. Gross stated, "Now that the taxes are more or less behind us, we would like to think about getting our personal accounts in order." Ms. Vasilescu replied to that email the same day, copying Ms. Hall and two other Wiss employees, "Susan needs estate planning: wills, trusts, etc."

---

monthly financial reports (signed under penalty of perjury by Mrs. Gross) filed in the chapter 11 case. This pattern of material falsehoods resulted in the conversion of the Wireless chapter 11 case to a chapter 7 proceeding and the appointment of a trustee.

At some point, Mrs. Gross was referred to and had a telephone conversation with an attorney named Michael Canarick. He sent a follow-up email to Mrs. Gross dated December 5, 2019, summarizing the conversation. (Dkt. 80-8, Plaintiff Ex. 15.) It listed the perceived advantages of setting up a "QTIP Trust,"[4] including avoiding possible complications facing the Grosses because of possible personal liability of Mr. Gross due to a past business venture. (*Id.*) The same email relayed, "[W]e decided that Susan would want to leave her assets to a QTIP trust for Laslo if she predeceases him. The reason for this is that assets in a QTIP are protected from the creditors of the surviving spouses.…If the issue involving Laslo's first business goes away then Susan can update her will and leave assets directly to Laslo." (*Id.*) At trial, Mrs. Gross denied having any knowledge of what "Laslo's first business" referred to and why that might be a motive to set up a trust. (Trial Audio at Dkt. 75, 00:53:51.)[5]

The Trust was formed on February 4, 2020. (Dkt. 80-5, Plaintiff Ex. 9, the "Trust Agreement"). Mrs. Gross executed the Trust Agreement as the initial donor, and Mr. Gross executed it as the trustee. (*Id.*) The Trust beneficiaries are the adult children of Mr. and Mrs. Gross, being David, Daniel, and Michael Gross. (*Id.*) Two bank accounts were set up in the name of the Trust (identified as account numbers ending in -0673, and -7521). (Trial Audio at Dkt. 75, 00:29:23, Dkt. 80-4, Plaintiff Ex. 8.) Mrs. Gross was responsible for handling the bank accounts. (Trial Audio at Dkt. 75, 00:30:39).

**The Wireless/SmartSky relationship deteriorates**

---

[4] A Qualified Terminable Interest Trust ("QTIP Trust") is an estate planning tool, often used to take advantage of the marital deduction while maintaining control over the ultimate distribution of assets at the death of the surviving spouse. *See generally Peterson Marital Trust v. Commissioner*, 102 T.C. 790, 810 (1994); 26 U.S.C. § 2056(b)(7).

[5] The email from Mr. Canarick demonstrates he was summarizing a conversation he had with Mrs. Gross alone, which Mr. Gross was not present for. (Plaintiff Ex. 15 "Susan – it was great speaking with you earlier. Laslo – I look forward to speaking with you in the future.") It strains credulity that Mrs. Gross could both have no knowledge of what business Mr. Canarick is referring to while Mr. Canarick would be informed enough of Mr. Gross' business concerns to provide advice.

Meanwhile, beginning as far back as March 2019, the Investment Offer and corresponding prospectus raised concerns within Wireless that SmartSky would not have access to sufficient funding necessary to pay purchase orders it had issued to Wireless. (Trial Audio at Dkt. 74, 00:33:30.) By this point, according to Mrs. Gross, the relationship with SmartSky was costing Wireless "hundreds and hundreds of thousands of dollars at every step, every month." (Trial Audio at Dkt. 74, 00:09:25.) Wireless was spending significant funds on buying equipment, certifying product in national labs, and taking other steps to fulfill its end of the Teaming Agreement. (Trial Audio at Dkt. 74, at 00:09:38.)

Mr. Gross began conversations with SmartSky regarding program funding in January 2020. (Trial Audio at Dkt. 74, 00:15:10 ("We had those discussions with [SmartSky] in January.")) During those conversations, he reiterated Wireless's concerns by requesting further assurances from SmartSky of adequate funding for the "entire program" rather than just piecemeal, individual purchase orders. (Trial Audio at Dkt. 74, 00:14:50-00:15:15.) Wireless proposed what it deemed to be reasonable assurances, such as SmartSky putting money in escrow or providing Wireless with a letter of credit to ensure that the "entire program" would proceed and was adequately funded. (*Id.*) According to Mr. Gross, financial pressures facing Wireless were mounting due to a deterioration in its SmartSky relationship. Wireless had "committed millions of dollars to design, develop, produce" components under the Teaming Agreement that were now in jeopardy, leaving Wireless "on the hook" to its manufacturers in Florida. (*Id.*) Wireless became during the "March, April, June timeframe" of what it deemed further indications of SmartSky's problematic financial picture. For example, SmartSky began purchasing antennas from another vendor "not at the 100 systems they ordered, but one at a time. . . ." (Trial Audio at Dkt. 74, 00:16:17.)

In the spring of 2020, Wireless "went from . . . delivering thousands of units to hundreds of units" to SmartSky. (Trial Audio at Dkt. 74, 00:14:02.)  SmartSky indicated it would like to renegotiate the terms of various purchase orders. (Trial Audio at Dkt. 74, 00:16:43). SmartSky's refusal to provide funding beyond "the next delivery" made Wireless "concerned, actually terrified" about SmartSky's future ability to fund the relationship.

**The Transfer**

During this same period of time, preparations were being made for the Transfer.  On March 6, 2020, Wireless sent the million dollars to the Trust. Defendants acknowledge the Transfer consisted of funds generated by the earnings of Wireless, and admit Wireless received nothing in exchange for the Transfer. (Trial Audio at Dkt. 75, 00:35:43; Stipulation #4.)  As noted, on the date of the Transfer, Mrs. Gross still owned 99.99% of Wireless.

Within a month, the Trust used a portion of the funds to purchase a farm located in Watauga County, North Carolina, known as the "Todd Property." Acquisition of the Todd Property had been contemplated by Mr. and Mrs. Gross since at least December 2019. (Dkt. 80-8, Plaintiff Ex. 15.)  In an email to Mr. Canarick, Mrs. Gross indicated "[w]e are looking at purchasing a piece of property in Western North Carolina. I am not sure how long this will take but we would like the trust to buy this property." (*Id.*) The Todd Property continues to be owned by the Trust today. (Trial Audio at Dkt. 75, 00:34:25.) A mortgage for around $190,000 secured by the Todd Property was subsequently obtained by the Trust. (Trial Audio at Dkt. 75, 00:34:47.)

**Arbitration with SmartSky**

In April of 2020, Mrs. Gross had a conversation with representatives of SmartSky's financier, Farnum Capital, which raised even higher the red flags regarding the adequacy of funding. After that conversation, Wireless began to make demands for SmartSky's adequate

10

assurance. In May of 2020, Wireless invoked the dispute resolution provisions of the Teaming Agreement. When negotiations stalled, on September 10, 2020, SmartSky filed a complaint against Wireless, Laslo Gross, Susan Gross, and others for alleged violations of the Teaming Agreement.

The dispute was referred to arbitration. On October 1, 2021, after a two-week hearing before a three arbitrator panel, an 81-page award for a base sum of $10,000,000.00 in damages was issued in favor of SmartSky for breach of the Teaming Agreement and other contracts.[6] (Dkt. 80-2, Plaintiff Ex. 3 at 14-102, the "Arbitration Award.") SmartSky was also awarded $1,963,676.59 for legal fees and expenses; $525,215.45 for arbitration costs incurred by SmartSky, and $60,000.00 in sanctions for violations of various orders of the arbitration tribunal against Wireless and the other respondents. A permanent injunction was also issued against Wireless and the other respondents for activities relating to confidential information and other intellectual property of SmartSky.[7]

Due to the size and effect of the Arbitration Award and the catastrophic effect on its business, Wireless filed a voluntary chapter 11 bankruptcy petition on March 9, 2022 (BK Dkt. 1). The case was converted to chapter 7 on October 12, 2022 (BK Dkt. 279). SmartSky timely filed its proof of claim for $12,986,212.33 (BK Claim 5-1). The claim, as to which no objection has been filed, is by far the largest unsecured claim in the case.

---

[6] The arbitrators noted "the parties herein have articulated widely divergent views of the nature and terms of their relationship. . ." (Arbitration Award at ¶ 194.) The arbitration tribunal determined that Wireless' demand for adequate assurances "was made as part of a negotiating strategy to secure additional rights in the [d]eveloped IP [other products]." (Arbitration Award at ¶ 208.)

[7] Judgment was entered by the United States District Court for the Middle District of North Carolina on February 7, 2022 (Dkt. 80-2, Plaintiff Ex. 3 at 6.) However, that judgment was set aside by the United States Court of Appeals for the Fourth Circuit for lack of subject matter jurisdiction by order and opinion dated February 13, 2024. *See SmartSky Networks, LLC v. DAG Wireless, Ltd.*, 93 F.4th 175 (4th Cir. 2024), SmartSky therefore proceeded to obtain a judgment on the arbitration in North Carolina Superior Court by order dated August 27, 2024. *See* Notice by SmartSky Networks, LLC, Dkt. 265, *SmartSky Networks, LLC v. Wireless Systems Solutions, LLC et al.*, Case No. 1:20-cv-00834-TDS-LPA (Aug. 30, 2024, M.D.N.C.). Susan Gross and Laslo Gross have appealed the Superior Court order to the North Carolina Court of Appeals, where, as of the time of trial (and this writing), the matter remains pending. (*See generally* Dkt. 59, Audio from April 9, 2025 hearing.)

## RELEVANT LAW AND ANALYSIS

### I.    Avoidance pursuant to 11 U.S.C. § 544(b)(1)

In this case, the Trustee seeks avoidance of the Transfer pursuant to 11 U.S.C. § 544(b)(1). Section 544(b)(1) does not create a substantive cause of action, but instead gives a bankruptcy trustee the power to avoid a transfer of an interest of a debtor in property or an obligation incurred by the debtor that is voidable under applicable law by a creditor holding an allowed claim at the time or as a result of the subject transfer. Therefore, it is necessary for the Trustee to identify such a creditor. For the reasons discussed herein, SmartSky fulfils the "golden creditor" function, and the Trustee steps into its shoes. He therefore has standing to pursue this action against the Defendants. The Trustee bears the burden of establishing that the transfer was fraudulent. *In re Parker*, 2015 WL 4747536 at *8 (Bankr. E.D.N.C. Aug. 10, 2015).

### II.    North Carolina Uniform Voidable Transactions Act

Having identified the requisite "golden creditor," Trustee seeks recovery under two separate provisions of the North Carolina Uniform Voidable Transactions Act:  N.C. Gen. Stat. § 39-23.4(a)(1) and N.C. Gen. Stat. § 39-23.4(a)(2). Under Section 39-23.4(a)(1), a transfer is voidable if the debtor made the transfer "[w]ith intent to hinder, delay, or defraud any creditor of the debtor" whereas Section 39-23.4(a)(2) allows avoidance of a transfer made by the debtor if the transfer occurred "[w]ithout receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (a) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or (b) intended to incur, or believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due."[8]

---

[8] At trial, Trustee elected not to pursue a claim for constructive fraud under N.C. Gen. Stat. § 39-23.5(a).

### A. Actual Fraud

#### 1. Badges of Fraud

To prove actual fraudulent transfer, the Trustee is tasked with demonstrating that Wireless made the Transfer with intent to hinder, delay, or defraud any creditor of Wireless under Section 39-23.4(a)(1). "Actual intent is inherently difficult to determine." *In re Coley*, 608 B.R. 625, 635 (Bankr. E.D.N.C. 2019). Rarely will a fraudster admit outright to the commission of a devious act. A transferor's intent must therefore be gleaned and deduced through the consideration of circumstances surrounding a transfer. In particular, fact finders should analyze so-called "badges of fraud" as listed in N.C. Gen. Stat. § 39.23.4(b). The statute lists thirteen nonexclusive examples of badges of fraud, being whether:

(1) The transfer or obligation was to an insider;
(2) The debtor retained possession or control of the property transferred after the transfer;
(3) The transfer or obligation was disclosed or concealed;
(4) Before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) The transfer was of substantially all the debtor's assets;
(6) The debtor absconded;
(7) The debtor removed or concealed assets;
(8) The value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
(9) The debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) The transfer occurred shortly before or shortly after a substantial debt was incurred;
(11) The debtor transferred the essential assets of the business to a lienor that transferred the assets to an insider of the debtor;
(12) The debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as they became due; and
(13) The debtor transferred the assets in the course of legitimate estate or tax planning.

N.C. Gen. Stat. § 39-23.4(b).

13

"When analyzing these factors to make a determination of the debtor's intent, a court should evaluate the entirety of the circumstances surrounding the transaction at issue and 'may appropriately take into account all indicia negativing as well as those suggesting fraud.'" *In re Schofield-Johnson, LLC*, 462 B.R. 539, 543 (Bankr. M.D.N.C. 2011) (quoting N.C. Gen. Stat. § 39-23.4(b) cmt. 7). Badges of fraud may also be considered by the court in evaluating the debtor's intent: "[A] determination concerning fraudulent intent depends largely upon an assessment of the credibility and demeanor of the debtor." *Mercantile Peninsula Bank v. French (In re French)*, 499 F.3d 345, 353 (4th Cir. 2007); *see also In re Coley*, 608 B.R. at 635 (quoting *In re French* in discussing N.C. Gen. Stat. § 39-23.4(b)). While the presence of one single badge of fraud is generally insufficient to establish actual fraudulent intent, a "confluence of several can constitute conclusive evidence of an actual intent to defraud, absent significantly clear evidence of a legitimate supervening purpose." *Whitaker v. Mortgage Miracles, Inc. (In re Summit Place, LLC)*, 298 B.R. 62, 70 (Bankr. W.D.N.C. 2002).

## 2. Analysis

At trial, both Mrs. Gross and Mr. Gross testified as to the deteriorating relationship of Wireless and SmartSky, the formation of the Trust, their intentions for it, and the circumstances surrounding the Transfer. Neither of the two witnesses were entirely forthcoming in their testimony, raising questions as to their credibility in recounting the events leading up to the Transfer. Mrs. Gross in particular excessively equivocated throughout her testimony, consistently contradicting her prior deposition testimony, debating semantics, and even denying the efficacy of the Stipulations.[9]

---

[9] As one example, she debated whether the purchased property was a "farm":

Trustee: "Shortly after Wireless made the transfer on March 6, 2020 approximately $500,000.00 of the amount that was transferred was used to purchase a farm in Watauga County. Is that correct?"

The testimony, exhibits, and relevant circumstances reveal the presence of multiple badges of fraud surrounding the Transfer. First, it is indisputable (and even Mrs. Gross did not contest) that the Trust is an "insider" of Wireless given that Mrs. Gross owned virtually all of the company; she and her husband created and ran Wireless; she spearheaded setting up the Trust; family members were the intended beneficiaries thereof; and Mr. and Mrs. Gross would have the full use, benefit, and enjoyment of the Todd Property.[10] Second, as a corollary, it is admitted Mr. and Mrs. Gross controlled both Wireless and the Trust at all relevant times. Third, it is stipulated that Wireless received no value or consideration for the million dollars that made up the Transfer, thereby imposing the eighth listed factor. Fourth, as discussed at length in the constructive fraud section below, Wireless was left without an ability to pay its debts as the same came due even

---

Mrs. Gross: "It was used to purchase a piece of property, it was not a farm."

Trustee: "You had a deposition that was taken in this case."

Mrs. Gross: "The intent was to make it a farm, but it was not a farm in its present, in that state when we purchased it, when the Trust purchased it I should say."
(Trial Audio at Dkt. 75, 00:30:58- 00:31:37.)

Trustee: "Was it in fact the case that the property that was purchased was a farm?"

Mrs. Gross: "The property that was purchased was originally a farm . . . they were not working farms. They were originally a farm but when the property was purchased it was not a farm. Our intention was to make it into a farm and that's why it is referred to as a farm [in her deposition] but it is not it a working farm."

(Trial Audio at Dkt. 75, 00:33:46-00:34:19.)

    In another instance, Mrs. Gross contradicted a pre-trial stipulation that Wireless began its contract acting as a supplier of SmartSky for components of air to ground wireless communications network starting December 23, 2017. When confronted with this contradiction, Mrs. Gross reiterated that the date was incorrect, asserting she "do[es] not even know what a stipulation is." (Trial Audio at Dkt. 75, 00:39:12). It was abundantly clear from her equivocations, combative demeanor, and selective memory on the witness stand that Mrs. Gross knew far more than what she was willing to say, and avoided answering the Trustee's questions in her responses.

[10] *See* N.C. Gen. Stat. Ann. § 39-23.4, cmt. 6 ("The courts have uniformly recognized, however, that a transfer to a closely related person warrants close scrutiny of the other circumstances, including the nature and extent of the consideration exchanged.")

15

though Mr. and Mrs. Gross were already aware of and preparing for the controversy with SmartSky that led to personal and corporate defeat in the Arbitration Award.

Consideration of the fourth enumerated badge reveals premeditation on the part of Mr. and Mrs. Gross acting for Wireless. Mr. Gross admitted in his testimony concerns had arisen the Spring of 2019 regarding SmartSky's ability to fund its relationship with Wireless. The circumstances indicate this problem was known even earlier. SmartSky approached Wireless and asked Wireless to make a $25 million investment in SmartSky. Mr. Gross testified at trial that the prospectus presented to Wireless in conjunction with the Investment Offer made Wireless "nervous" regarding SmartSky's funding. (Trial Audio at Dkt. 74, 00:33:00). This series of events *predate* the April 25, 2019 Teaming Agreement. The business relationship between SmartSky and Wireless continued to deteriorate, leading literally to an existential crisis for Wireless since its business was entirely dependent on good relations with and continued funding by SmartSky. This predicament led to planning on the part of Mr. and Mrs. Gross on how to protect the assets of Wireless, which was done not just by removing funds (relevant here, the Transfer) from Wireless, but also, as found in the arbitration panel, by "intentionally and maliciously misappropriat[ing] [SmartSky's] trade secrets by, inter alia, marketing [SmartSky's] ATG Products as their own." Arbitration Award ¶ 324.[11]

---

[11] See also Arbitration Award ¶ 259 ("Therefore, the Tribunal holds that [Wireless], in marketing the Velocity XG System as its own . . . breached the restrictions in the Teaming Agreement pertaining to Intellectual Property and confidential Information. [C]redible evidence herein clearly shows that developing an ATG System from scratch would require many years or even a decade, only corroborates that [Wireless] was in the process of misappropriating [SmartSky's] Intellectual Property."); Arbitration Award ¶ 331 (noting respondents tried to "steal the core of [SmartSky's] business through the unfair acts."); Arbitration Award ¶ 321: "[W]e hold that the Grosses misappropriated, and conspired to misappropriate, SSN's trade secrets . . . ."; Arbitration Award ¶ 324: "[T]he Grosses intentionally and maliciously misappropriated Claimant's trade secrets by, inter alia, marketing SSN's ATG Products as their own to SSN's main competitor and customer prospects."

Mr. and Mrs. Gross point to the thirteenth enumerated badge as a source of exculpation, repeatedly arguing throughout the trial that the Trust was formed as a part of legitimate estate planning. Mrs. Gross opined that the Trust had a legitimate purpose (estate planning), and therefore in her view could not be a party to a fraudulent transfer. Ergo, she maintains, the Transfer could not be fraudulent. While estate planning concerns may be a legitimate reason to form a trust, the formation of this Trust is not at issue. Rather, the examination here centers on the Transfer, not the Trust. Even an otherwise legitimately created trust does not shield a transfer that is fraudulent in nature.  Further, this contention is made despite the surrounding circumstances: the timing of the souring relationship between Wireless and SmartSky, a relationship that within one year's time went from mutually beneficial to concerns regarding the adequacy of SmartSky funding, to a deteriorated relationship that ultimately led to the fateful and hard-fought arbitration.

In September 2019, Mrs. Gross engaged Wiss employees to discuss estate planning services for herself and Mr. Gross. On December 5, 2019, Mrs. Gross met with Attorney Canarick who advised her about setting up a trust, and on December 17, 2019, Mrs. Gross indicated that she would like the Trust to purchase property. Shortly thereafter, sometime in January 2020, Mr. Gross was involved in a meeting with SmartSky representatives in which he demanded immediate assurances that SmartSky had adequate funding to cover the entirety of Wireless's program with SmartSky. The Trust was formed on February 4, 2020, after Mr. Gross's meeting with SmartSky representation. The Transfer occurred on March 6, 2020, and the Trust purchased the Todd Property on March 26, 2020. During this same "March, April, June timeframe" Wireless became aware of the antenna purchasing problems, and in April of 2020 Mrs. Gross received further information from Farnum Capital regarding SmartSky's funding. That same month, after receiving

this information, the Grosses began making demands for adequate assurances and continued the informal discussions with SmartSky regarding funding concerns.

While the Grosses took steps to protect their assets through the creation of the Trust and the Transfer, Wireless also began taking steps to breach the Teaming Agreement. By June 1, 2020 Wireless had exercised the dispute resolution provisions of the Teaming Agreement. (Dkt 85-11, Plaintiff Ex. 16.) On June 1, 2020, Mrs. Gross sent an email to an attorney, David Sarr, regarding the Teaming Agreement. (*Id.*) In her email, Mrs. Gross stated that the Teaming Agreement was "problematic" due to there being "little room for [Wireless] to terminate, among other things." (*Id.*). Mr. Gross testified at trial that on June 18, 2020 he told Dave Claassen, a SmartSky representative, that Wireless was "shutting everything down." (Trial Audio at Dkt. 74, 00:39:18.) What "everything" refers to is somewhat unclear, as Mr. Gross contends he was referring only to a licensing issue regarding an integration product Wireless was working on. On July 29, 2020 Wireless sent SmartSky a formal letter of repudiation and breach. (Dkt. 79, Def. Trial Ex. A., the "Repudiation Letter"). The Repudiation Letter referenced an earlier letter, sent June 26, 2020, in which Wireless sought "adequate assurances of performance." (*Id.*) The "reasonable grounds for insecurity" that Wireless pointed to in the Repudiation Letter primarily center around payment and financing issues. (*Id.*) Wireless had been "seeking to resolve" the various issues, including payment, "for two years prior." (*Id.*) Based on the evidence in the record and testimony elicited at trial, Wireless was wary of SmartSky long before the dispute resolution provisions were invoked.

The contention that the Trust formation, making of the Transfer, and purchase of the Todd Property were all solely for "estate planning purposes," belabors and ignores the actual circumstances of Wireless, and it is the circumstances of transfer by a debtor (Wireless), not the claimed basis for the existence of the recipient (here, the Trust) that must be the center of the

18

court's attention.  The intertwined relationship between the Trust and Wireless resulted from their complete domination and control by Mr. and Mrs. Gross. Standing alone, the fact that a transfer is made to a relative or to an affiliated corporation has not been regarded as a badge of fraud sufficient to warrant avoidance; but when that circumstance is "***by any other evidence*** of intent to hinder, delay, or defraud creditors. The courts have uniformly recognized, however, that a transfer to a ***closely related*** person warrants ***close scrutiny*** of the other circumstances, including the nature and extent of the consideration exchanged." N.C. Gen. Stat. § 39.23-4, cmt. 6 (emphasis added).

Where, as the court finds here, the interests of one related entity ends and that of another begins have merged and where corporate, trust and personal interests know no boundary, a strong circumstantial indication of intent to commit a fraudulent transfer is presented. Here, the funds forming the Transfer flowed from entity to entity with little to no formality and without any consideration. Wireless sent $1,000,000 directly to the Trust, which soon thereafter purchased the Todd Property. However, everything continued to be treated as one large pile of family assets.  For example, while the Todd Property was ostensibly owned by the Trust, accessible to the Grosses individually, it was also available to Wireless as a source of funding as it was used as collateral to secure a mortgage and infuse cash back into Wireless. (Trial Audio at Dkt. 75, 00:35:58.). Mr. Gross was the trustee of the Trust, which kept the Trust assets within the reach of Wireless, and he took no actions without the agreement of his spouse Mrs. Gross. While Mr. Gross may have legally controlled the Trust, and Mrs. Gross controlled  Wireless, first as the 99.99% owner and then as family trustee of the majority owner Gross Family Protection Trust, in reality they jointly controlled both entities together as family assets, thereby implicating the second enumerated badge of retained control of the property after transfer.[12]  This fact, as well as the Transfer being to a

---

[12] N.C. Gen. Stat. § 39-23.4(b)(2), "[t]he debtor retained possession or control of the property transferred after the transfer."

related entity materially adds to the growing list of factors weighing in the Trustee's favor by acting as a sturdy leg of a unified fraudulent scheme.

Taken together, the presence of several badges of fraud, including insider status, control of both entities, lack of consideration, the brewing material dispute with SmartSky, use of the Trust as the receipt vehicle rather than Mr. and Mrs. Gross, and the host of inconsistent statements by Mrs. Gross demonstrates actual fraudulent intent on the part of Mr. and Mrs. Gross acting for Wireless and the Trust in effectuating the Transfer to the Trust. They were acting to protect assets in the event of an eventual loss to SmartSky, which later solidified its more than twelve million dollar claim against Wireless in arbitration. The excuse of personal "estate planning" by Mrs. Gross is merely a convenient mechanism used to camouflage the true intentions of Mr. and Mrs. Gross. Even if believable, it does not outweigh the several other factors when viewed together in the course of an examination centered on the Transfer, not the formation of the Trust. An otherwise reasonable basis for the forming the Trust does not inoculate it in later receiving fraudulent transfers.

### 3.  Actual Fraud Liability

The court concludes, from the aggregate circumstances revealing the presence of numerous badges of fraud, that the real purpose of the Transfer was to get money out of Wireless and into a protected asset before anticipated and risky litigation ensued. The Transfer was just one part of a scheme to hinder, delay and defraud creditors, including but not limited to SmartSky as the golden creditor for Bankruptcy Code section 544 and attendant N.C. Gen. Stat. § 39-23.4 purposes. The court finds and concludes the Trustee presented sufficient evidence of actual fraud on the part of the Defendants and their controlling parties, and that the Defendant's defense that the Transfer was

part of an estate planning process is unpersuasive. The Transfer is avoided as an event of actual fraud under 11 U.S.C. § 544(b)(1) and N.C. Gen. Stat. § 39-23.4(a)(1).

### B. Constructive fraud

A finding of constructive fraud under the applicable North Carolina version of UVTA, N.C. Gen. Stat. § 39-23.4(a)(2), requires a showing that Wireless received no reasonably equivalent value in exchange for the Transfer, as a result of which the debtor was left with unreasonably small assets *or* that a debtor has an inability to pay debts as the same become due.[13]

### 1. Lack of reasonably equivalent value

"The first requirement of the pertinent constructive fraud provisions under N.C. Gen. Stat. § 39-23.4(a)(2) is that the debtor made the transfer without receiving reasonably equivalent value in exchange." *In re Parker*, 2015 WL 4747536 at *8 (Bankr. E.D.N.C. Aug. 10, 2015). "[T]he focus is on the **consideration received by the debtor**; a large disparity between what the debtor gave and what it received typically indicates that the exchange was not for reasonably equivalent value." *Id.* (emphasis added).

Defendants argue that the "value" Wireless received was the "proper return of equity to its interest holders," as the Transfer was a distribution of retained earnings to Mrs. Gross, an interest holder. (Dkt. 84 at 9-11.) Defendant further suggests because the transfer was not prohibited or improper under the North Carolina LLC Act, the transfer is deemed to have "value." However, the question is not whether such a distribution is in accord with the LLC Act, but rather if *Wireless* received value for the transfer. "[A] distribution of profits or dividends to L.L.C. members that is not compensation or salary for services rendered is not a transfer in exchange for reasonably equivalent value . . . ." *See In re Teknek, LLC*, 343 B.R. 850, 861 (Bankr. N.D. Ill. 2006) (citing

---

[13] Again a golden creditor is required with SmartSky fulfilling that role for reasons and based upon the findings in the section above.

*In re Brentwood-Lexford Partners, LLC*, 292 B.R. 255, 267-68 (Bankr. N.D. Tex. 2003)); *see also Plus 352, S.A. v. Giraud*, 2022 WL 911574 at *5 (M.D. Fla. Mar. 29, 2022) ("Distributions based on an owner's equity interest do not hold a reasonably equivalent value."). Testimony at trial reveals Wireless did not receive any value for the Transfer:

> Trustee: With respect to the transfer, the $1,000,000.00 at the time that the $1,000,000.00 was transferred from Wireless to the Susan L. Gross Family Trust, Wireless didn't receive any property back is that correct?
>
> Mrs. Gross: In exchange? You're saying at the time of the transfer was money, was anything exchanged back and forth between Wireless and the Trust?
>
> Trustee: Yes
>
> Mrs. Gross: No

(Trial Audio at Dkt, 75, 00:35:11 – 00:35:43) (cleaned up for clarity).

Because Wireless received no consideration, the Transfer was made without reasonably equivalent value.

### 2. Wireless was not left with unreasonably small assets

At the time of the Transfer, evidence and testimony elicited at trial show Wireless was in a strong financial condition. In March of 2020, the LLC had significant cash reserves, was profitable, and had minimal liabilities (Trial Audio at Dkt. 75, 02:48:01, *see also* Dkt. 80-6 Plaintiff Ex. 10). Further, financial statements from the year of the Transfer confirm that the LLC maintained positive balances afterwards. (Dkt. 80-6, Plaintiff Ex. 10.)  As such, the Trustee did not demonstrate that following the Transfer, Wireless was left with unreasonably small assets.

### 3. Incurring debts beyond ability to pay

The question therefore hinges on whether Wireless intended to incur or believed Wireless would incur debts beyond its ability to pay as they came due. The record reflects Wireless believed that it would incur significant debts from two potential sources.

### a. Breach of the Teaming Agreement

Wireless was well aware of the risks associated with repudiating the obligations owed to SmartSky under the Teaming Agreement. Despite testimony showing Wireless's concerns regarding SmartSky's funding predated even the Teaming Agreement, only after the Trust was created, the Transfer was made, and the Todd Property was purchased did Wireless began demanding assurances from SmartSky. Only *after* the Transfer did Wireless feel comfortable taking actions such as attempting to renegotiate the Teaming Agreement (June 2020), halting work until disputes were resolved (June 18, 2020), and formally demanding adequate assurances from SmartSky (June 26, 2020). Wireless, as shown by Mr. and Mrs. Gross's actions, recognized that taking these steps would result in a dispute and probable legal action against it, which could result in a significant judgment against it.

### b. Mounting concerns related to the Florida contract manufacturer

Even if Wireless did not believe that a significant debt would be incoming due to the Debtor's breach of the Teaming Agreement, testimony at trial reveals another source of significant debt. Mr. Gross testified Wireless was "spend[ing] hundreds and hundreds of thousands of dollars at every step every month" due to its relationship with SmartSky. (Trial Audio at Dkt. 74, 00:09:25.) By April 2020, Wireless was "concerned, actually, terrified" about SmartSky's ability to pay for the products Wireless was producing due to possible funding issues. (Trial Audio at Dkt. 74, 00:14:20.)  Mr. Gross testified that Wireless "[was] terrified that if the funding dried up we would be stuck with all of this because they have no revenue." (Trial Audio at Dkt. 74, 00:19:12.) "All of this" seemingly refers to the "$8,000,000.00 of parts and $20,000,000.00 in systems" that were sitting at the factory waiting to be produced. (Trial Audio at Dkt. 74, 00:20:36.) Most importantly, Wireless had spent "millions of dollars to design, develop, produce" products for

SmartSky, which would leave Wireless "***on the hook***" to its contracted manufacturer for parts. (Trial Audio at Dkt. 74, 00:14:55 – 00:15:08.) The testimony of Mr. Gross reveals Wireless believed it would incur significant debt, owed to its manufacturer and suppliers, if SmartSky was unable to find the financial footing it needed in order to fund the entire program.

By the time of the Transfer, Wireless was facing significant financial pressure from not one but two sources for which it reasonably believed it would incur a significant debt, and it was unable to pay that debt when it became due. As a result, Mr. and Mrs. Gross orchestrated a plan to protect and transfer assets from Wireless and avoid paying creditors.

### 4. Constructive Fraud Liability

Because Wireless received nothing in consideration of or exchange for the Transfer, and by the time of the Transfer, it was incurring or had incurred debts which it would not be able to pay, the Transfer is also avoidable under 11 U.S.C. § 544(b)(1) and N.C. Gen. Stat. § 39-23.4(a)(2).

### CONCLUSION

For the reasons stated above, a judgment for the Trustee and against the Defendants avoiding the Transfer on the grounds of both actual and constructive fraud is entered by separate and concurrent Judgment and Order.

### END OF DOCUMENT